IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT G. WING, as Receiver for VESCOR CAPITAL CORP., et al.,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>BRUCE J. DOCKSTADER, et al.<br>Defendants. | MEMORANDUM DECISION<br><br>AND ORDER<br><br><br>Case No. 2:08 cv 776<br>Judge Dee Benson |

The plaintiff, Robert G. Wing as Receiver, moves this court for summary judgment, arguing that undisputed facts show that the defendants received fraudulent transfers and that the Receiver is therefore entitled to the return of the money VESCOR[1] paid to Mr. Dockstader as referral fees and investment returns (the difference between the amount of the Dockstaders' investments and the amount they received from VesCor). (ECF No. 11). The defendants oppose this motion and on September 22, 2010, the defendant moved for leave to file a supplemental memorandum in opposition to the Receiver's motion. (ECF No. 41) The court heard oral argument on both motions on September 23, 2010. M. David Eckersley appeared on behalf of the Receiver and Shawn T. Farris appeared on behalf of the defendants. After a careful review of

---

[1] Mr. Southwick operated a web of over 150 corporations and limited liability companies. For simplicity, the court refers to these corporations collectively as VesCor.

the parties' written submissions and oral argument, the court enters the following Memorandum

Decision and Order.

## FACTUAL BACKGROUND[2]

This case is one of many arising out of the collapse of an alleged Ponzi scheme

orchestrated and run by Val Edmund Southwick through a complex web of over 150

corporations and limited liability companies. In a state court action, Mr. Southwick pleaded

guilty to nine felony counts of securities fraud.  He was sentenced to serve the maximum term

allowed, nine consecutive 1 to 15 year prison terms.

On February 6, 2008, the United States Securities and Exchange Commission (SEC) filed

suit against Southwick and VesCor, alleging violations of the Securities Act of 1933 and the

Securities and Exchange Act of 1934.  This court appointed Robert G. Wing as Receiver for

VesCor on May 5, 2008.   The Receiver filed this ancillary case on October 6, 2008, alleging that

the defendants received fraudulent transfers from VesCor.

There are two types of financial transfers at issue in this case, referral fees and

investment returns. Defendant Bruce Dockstader provided contact information for VesCor to

individuals interested in investing with the VesCor operation.  VesCor paid Mr. Dockstader

$146,140 for providing this information.  Mr. Dockstader denies that he was employed by

VesCor or that these funds were commissions or referral fees.  Additionally,  Mr. and Ms.

Dockstader and two family trusts invested $1,226,974 in VesCor and received interest and

principal payments of $1,752,546.  In total, the defendants received $525,563 more than they

---

[2] Because the motion under review is for summary judgment, the court will rehearse the
facts in the light most favorable to the Defendants, the nonmoving party.

invested. The Receiver moved for summary judgment on June 6, 2009.

DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* Utah R. Civ. P. 56(c). "A 'material fact' is one 'that might affect the outcome of the suit under the governing law, and a 'genuine' issue is one for which 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal citation omitted).

The Receiver argues that he is entitled as a matter of law to a judgment that the investment returns and referral fees transferred to the defendants by Vescor were fraudulent transfers. In response, the defendants argue that the Receiver is barred from bringing these claims because he lacks standing and in the alternative failed to assert the claims before the expiration of the statute of limitations. The defendants also argue that there are disputed issues of fact as to whether the investment returns and the referral fees were fraudulent transfers. Finally, the defendants request a continuance pursuant to rule 56(f). The court will address each argument in turn.

## I.  THE RECEIVER IS NOT BARRED
### FROM BRINING ITS CLAIM AGAINST THE DEFENDANTS.

*A.  The Receiver Has Standing to Assert Claims on Behalf of the Vescor Entities.*

The defendants argue that the Receiver cannot assert fraudulent transfer claims on behalf of the Vescor entities because they are debtors not creditors.  This court has addressed this argument in another ancillary case similar to Mr. Dockstader's.  In *Wing v. Hammons*, No. 2:08-cv-620, 2009 U.S. Dist. LEXIS 41907 (D. Utah May 14, 2009),  the court concluded that the VesCor entities were injured when Southwick used them to commit fraud and waste and that once out from under Southwick's control, the entities were entitled to seek the return of the entities' fraudulently dissipated funds.  *Id.* at *8.  In reaching this conclusion, the court relied on the reasoning and approach of *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir. 1993), the seminal case addressing whether a Receiver has standing to pursue claims on behalf of the entities in receivership.

In their opposition to the Receiver's motion, the defendants have failed to persuade the court that this conclusion was incorrect.  The defendants turn the court's attention to *Global Grounds Greenery, LLC*, 405 B.R. 659 (D. Ariz. 2009), to suggest that *Scholes's* reasoning should not apply to this case.  *Global Grounds Greenery* is a bankruptcy case and has no application in this matter because the rights of a receiver or trustee may differ in the bankruptcy context.  *See Global Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558, 2006 U.S. Dist. LEXIS 53785, * 56 n.21 (S.D.N.Y. Aug. 3, 2006) (noting that "whatever appeal Scholes [sic] may have in the receivership context," it does not usually apply in the bankruptcy context).  Therefore, for the same reasons discussed in *Wing v. Hammons*, No. 2:08-cv-620, 2009 U.S.

Dist. LEXIS 41907 (D. Utah May 14, 2009), the court concludes that the Receiver has standing

to pursue fraudulent transfer claims on behalf of the VesCor entities.

    *B. Statute of Limitations*

    The defendants also argue that the Receiver is barred by the statute of limitations from

pursuing the claims against them.  According to the defendants, the Receiver is limited to

pursuing only those transactions that occurred after October 6, 2004–four years prior to the

initiation of this action.  Again, this is an argument that this court has already addressed.

    In *Wing v. Kendrick*, No. 2:08-cv-1002, U.S. Dist. LEXIS 41923 (D. Utah May 14, 2009)

the court acknowledged the four-year statute of limitations under the Uniform Fraudulent

Transfer Act but also determined that the Receiver was entitled to the benefit of the discovery

rule, which requires an action to be filed "within one year after the transfer or obligation was or

could reasonably have been discovered." Utah Code Ann. § 25-6-10.  In *Kendrick*, the court

concluded that the Receiver's claims were timely filed because they were filed within eight

months of the Receiver's appointment.  *Kendrick*, U.S. Dist. LEXIS 41923, at * 9.

    The statute of limitation calculations in this case are similar.  The Receiver filed its

claims against the defendants five months after his appointment.  Applying the discovery rule,

the court concludes that the case was timely filed.  Although the exact date of when the Receiver

discovered the allegedly fraudulent transfer is not presented in the materials currently before the

court, it defies reason that the Receiver could discover the transaction before his own

appointment on May 5, 2008. *See Carnie*, 2007 U.S. Dist. LEXIS 27610, *18 ("[U]nder the

discovery rule the action does not begin to accrue until the Receiver discovers the fraud and the

damages.").  The defendants argue that the statute of limitations should begin prior to the appointment of the Receiver because the Vescor entities themselves could have discovered the fraudulent nature of the transactions.  This argument ignores the actual operation of the VesCor entities.  Under Val Southwick, many, if not all, of the VesCor entities were used to defraud investors.  Under the theory of adverse domination, "as long as a corporation is controlled or 'dominated' by wrongdoers against whom a cause of action exists, the statute of limitations is tolled because the wrongdoers cannot be expected to bring an action against themselves." *Saunders v. Sharp*, 793 P.2d 927, 932 (Utah App. 1990) (determining not to extend the doctrine to excuse failure to raise an issue before appeal).  Utah has not formally adopted the adverse domination theory, but it has recognized its reasoning without criticism. *Id.*  Based on this acknowledgment and the doctrine's complimentary nature to the discovery rule, the court concludes that Utah would likely follow the lead of numerous other courts and adopt the theory. *See FDIC v. Hudson*, 573 F. Supp. 1039, 1042-43 (D. Kan. 1987) (concluding that Kansas would adopt the adverse domination theory); *Warfield v. Carnie*, No. 3:04-cv-633, 2007 U.S. Dist. LEXIS 27610, * 47 (N.D. Tex. Apr. 13, 2007) (concluding that Washington would adopt the adverse domination theory).

Applied to this case, the court concludes that the statute of limitations should be tolled until the appointment of the Receiver.  All the evidence in this case to date establishes that Val Southwick controlled the VesCor entities and used them as part of a scheme to defraud investors. In such circumstances, the entities themselves were party to the wrongdoing and cannot be expected to have brought claims against themselves.  Accordingly, the court rejects the

defendants' arguments and concludes that the Receiver's action was filed within the applicable statute of limitations.

## II. THE DEFENDANT HAS NOT ESTABLISHED A DISPUTED ISSUE OF FACT AS TO WHETHER VESCOR ENTITIES HAD PONZI-LIKE CHARACTERISTICS.

The defendants argue that whether all of the VesCor entities operated as one large Ponzi scheme is a disputed issue of fact. The defendants also argue that the facts show that by referring investors to VesCor, defendant Bruce Dockstader provided value to the company and therefore he accepted referral fees for a service of reasonably equivalent value and in good faith. In the alternative, Mr. Dockstader asserts that he only received $34,865 after October 6, 2004. As discussed above, the court has determined that the statute of limitations does not begin to run until the Receiver is appointed and the discovery rule also applies. Therefore, the Receiver has timely brought his claims for $146,140 in referral fees.

The Receiver's theory of fraudulent transfer relies on the Ponzi scheme doctrine to establish that the monies VesCor paid to the Dockstaders were fraudulent transfers. *See Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995). "Under the UFTA, a debtor's actual intent to hinder, delay, or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme." *Warfield v. Carnie,* No. 3:04-cv-0633, 2007 WL 1112591 *2 (N.D. Tex. Apr. 13, 2007); *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.") (quoting *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir. 2008)); *In re Indep. Clearing House*, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was

running a Ponzi scheme. Indeed, no other reasonable inference is possible."). To invoke the Ponzi scheme doctrine, the Receiver has endeavored to prove that VesCor operated as a Ponzi scheme. As evidence the Receiver relies an a forensic accounting of VesCor's financial and business records, and testimony of VesCor employees and insiders. The sum of this information caused the Receiver's expert, Gil Miller, to conclude that beginning in 2000 VesCor "exhibited characteristics of a Ponzi scheme." (Third Decl. of Gil A. Miller, ECF No. 17-2, ¶ 8).

Mr. Miller testified that VesCor mischaracterized the nature of their investment opportunities and any risk associated with making an investment. (*Id.* ¶ 12). VesCor promised returns while misstating the security collateralizing the investments. That is, investors were told their investment was secured by real property, including a first position trust deed when they were not. Additionally, Mr. Miller asserts that VesCor overstated its investment returns and understated its losses. VesCor also claimed to have a spotless track record, despite prior lawsuits and failed transactions. In fact, according to Mr. Miller, Vescor concealed its losses by paying earlier investors with money raised from later investors. (*Id.* ¶ 24). This was likely because VesCor did not generate profits or positive cash flow from its real estate investments and continually operated at loss as far back as 1991. (*Id.* ¶ 46).

The Receiver has also obtained testimony from former VesCor employees to establish that the VesCor entities were all part of Mr. Southwick's scheme. For example, a controller for VesCor, Monique Fisher, testified that VesCor commingled investor money. According to Ms. Fisher, when there wasn't enough money in one account to satisfy one entities' obligations, Mr. Southwick would transfer money between accounts in order to meet VesCor's obligations. In

addition, Ms. Fisher testified that new investor money was routinely used to pay old investors. (Dep. Monique Fisher, ECF No. 15-15).

The defendants' written opposition did not dispute the fact that VesCor was a ponzi scheme. In an eleventh hour effort, the defendants moved to supplement their memorandum in opposition in order to make this argument. Generally, supplemental briefing is discouraged and may only be filed with leave of court. In this case, the defendant did not provide the court with any justification for this late filing. The supplemental briefing does not purport to contain newly discovered facts or updated legal authority. Instead, the supplemental brief appears to contain information gleaned from another ancillary case. Under these circumstances, the court declines to grant leave to supplement the record.

In contrast to their written argument, during oral argument the defendants argued that whether VesCor operated as a Ponzi scheme is a disputed issue of fact. The defendants asserted that the 150 different entities under Val Southwick's control operated as separate entities and some of them generated a profit. However, these statements were wholly unsupported. When asked what evidence the defendants have to support their argument that some of the VesCor entities were not insolvent but instead legitimate business ventures, the defendants could only suggest that they may provide expert testimony at a later date. As described in Part IV of this decision and order, this case has progressed too far to still be looking for evidence or experts. Moreover, the defendants have presented no evidence that the monies VesCor paid them were linked to the alleged legitimate business ventures. Therefore, with no evidence presented to refute the Receiver's evidence, the court concludes that there is not a genuine issue of fact

whether VesCor operated as a Ponzi scheme. At present, all of the evidence before the court regarding whether VesCor operated as a Ponzi scheme comes from the receiver. There is no evidence presented by the defendants to create a disputed issue of fact on this subject.

Under the fraudulent transfer Act, the payouts to the defendants do not qualify as fraudulent transfers if the defendants provided reasonably equivalent value and received the payments in good faith. The parties in this case focus their attention on whether the defendants provided reasonably equivalent value. In the context of a Ponzi scheme this is difficult for even an innocent investor to do. "Where causes of action are brought under UFTA against Ponzi scheme investors, the general rule is to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers . . . ." *Donell*, 533 F.3d at 770. "If investors receive more than they invested, 'payments in excess amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity.'" *Donell*, 533 F.3d at 772 (quoting *In re Lake States Comm., Inc.*, 253 B.R. 866, 872 (Bankr. N.D. Ill. 2000). The payout of these fictitious profits to the defendants in this case did not benefit VesCor and instead simply depleted the scheme's resources faster. *Scholes*, 56 F.3d at 757. Accordingly, the payments were not for reasonably equivalent value and, therefore, were fraudulent transfers.

The defendants focus their argument on the referral fees VesCor paid Dockstader, arguing that by referring investors to VesCor, Mr. Dockstader provided reasonably equivalent value. In making this argument, Mr. Dockstader relies on *In re Universal Clearing House Company* and its progeny. In *Universal Clearing House*, a bankruptcy appeal, the court held that

in determining whether 127 contracted brokers provided value could not be determined as a matter of law based on the insolvent and Ponzi-like nature of the transferor. In reaching this decision, the court focused on the contract between the transferor and the brokers, which the court said created an antecedent debt for services performed. Applying the bankruptcy code, the court emphasized that the court must focus on the "value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise." *In re Universal Clearing House Co.*, 60 B.R. 985, 1000 (D. Utah 1986).

*Universal Clearing House* is not controlling. The Tenth Circuit has not yet ruled on this issue and it appears that there is a split between courts on how to apply the fraudulent transfer analysis to broker transferees who take money from a Ponzi scheme operation. *Compare In re Universal Clearing House Co.*, 60 B.R. 985, 1000 (D. Utah 1986); *In re Churchill Mortg. Invest. Corp.*, 264 B.R. 303 (S.D.N.Y. 2001); *In re First Commercial Mgmt. Group, Inc.*, 279 B.R. 230 (Bankr. N.D. Ill. 2002) *with Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006); *In re Randy*, 189 B.R. 425 (Bankr. E.D. Ill. 1995).

For multiple reasons, the court declines to adopt *Universal Clearing House* and its progeny in the context of this case. First, based on the facts alleged by Mr. Dockstader, much of the reasoning of *Universal Clearing House* does not apply to this case. Neither Mr. Dockstader nor the Receiver allege that Mr. Dockstader had a contract with VesCor to sell investments. Therefore, there was no antecedent debt owed by VesCor. Moreover, Mr. Dockstader is not licensed to sell securities, so any agreement he had with VesCor to act as an agent was illegal. Utah Code Ann. § 61-1-3(1). Mr. Dockstader cannot assert any right founded upon an illegal

contract.  *Sender v. Simon*, 84 F.3d 1299, 1307 (1996).  For this reason alone, the court

concludes that Mr. Dockstader did not provide reasonably equivalent value.

However, even if Mr. Dockstader did have a formal relationship with VesCor, the court

does not believe this would preclude it from finding as a matter of law that Mr. Dockstader did

not provide reasonably equivalent value for the referral fees VesCor paid him.  The court does

not see the circumstances of those who received referral fees for introducing investors to VesCor

as demonstrably different from the circumstances of the scheme's investors, who the court has

held did not provide reasonably equivalent value for their gain.  Admittedly, all alleged

fraudulent transactions are treated on a case-by-case basis.  However, the court disagrees with

the notion that a person paid to refer investors to a ponzi scheme is more akin to the venture's

utility provider than the investors.  *See In re First Commercial Mgmt. Group, Inc.*, 279 B.R. 230,

238 (Bankr. N.D. Ill. 2002) ("[T]here is also an ethical difference between an innocent broker

who performed services and less than innocent investors who, at best, tried to take advantage of

a 'deal' that should have been seen as too good to be true."); *In re Universal Clearing House* 60

B.R. at 999 (finding no material difference between brokers and ponzi scheme's landlord).  In

most cases, it seems, a person who refers investors to a ponzi scheme, whether knowingly or not,

is just as involved, and even more involved, in furthering the scheme as a passive investor.  In

this case, the court concludes that Mr. Dockstader cannot benefit from any illegal contract or

agreement he had with VesCor or for his contribution in keeping VesCor's fraudulent schemes

afloat.

### III. THE FUNDS THE DEFENDANTS RECEIVED
### SHOULD NOT BE OFFSET FOR TAXES OR ANY OTHER PAYMENTS.

The defendants assert that the amount of income taxes they paid on the monies they received from VesCor should be offset against any liability to the receivership. Without an offset, the defendants argue, they will not be able to realize the return of their full investment. The court finds this argument lacking in merit. First, the defendants cite no authority for this proposition, and this court is not aware of any. Second, allowing offsets would require complicated and imprecise accounting in order to determine which and the size of an offset should be allowed. Moreover, this process would lead to unjust results.

The Ninth Circuit Court of Appeals explained in *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008), allowing offsets would defeat the purpose of the Uniform Fraudulent Transfer Act. First, "there is simply no principle by which to limit such offsets." *Id.* at 779. Second, "even if we could limit permissible offsets to a few areas such as taxes paid, this would introduce complex problems of proof and tracing into each case." *Id.* Finally, allowing offsets would create problems of equity because any amount offset, which would differ based on the financial situation of each defendant, would come at the expense of other investors. *Id.* In light of the great cost and minimal benefit achieved by allowing offsets, the court concludes that the amount the Receiver is entitled to recover from the defendants should not be offset by the amount of taxes paid by the defendants. If the defendants believe the taxes paid on their VesCor profits were erroneous, they "may wish to pursue [their] remedies with the IRS." *Id.*

## IV. THE RULE 56(f) MOTION IS DENIED

Finally, in response the Receiver's motion, the defendants requested a continuance pursuant to Federal Rule of Civil Procedure 56(f). The court concludes that such a continuance would be inappropriate in this case. "The crux of Rule 56(f) is that 'summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Hackworth v. Progressive Casualty Ins. Co.*, 468 F.3d 722, 732 (10th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 n.5 (1986)). To properly invoke Rule 56(f), the party seeking dismissal or a continuance must submit with its motion an affidavit "identifying the probable facts not available and what steps have been taken to obtain these facts." *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992). The affidavit should also explain how this discovery will help him establish that there is a genuine issue of material fact. *Id.*

In this case, the defendants' request and affidavit in support of a continuance both assert that they need more time to analyze, trace, verify, and compare the transactions related to the VesCor operations. The court acknowledges that the facts underlying this case are voluminous and complicated. However, the court is not persuaded that the defendants have been diligent in pursuing discovery in this case. Instead, the record reflects a strategy of delay. For instance, the motion before the court was filed in the beginning of June 2009. The Receiver granted the defendants two-months worth of extensions in order for them to discover the facts they believed necessary to oppose the motion. The defendants' motion was then filed five days before the close of discovery and six days before the defendants' expert reports were due. However, the

14

Receiver reports that even today the defendants have not sent any discovery requests to the Receiver, have not taken any depositions, including the expert upon which the plaintiff's rely on for the motion for summary judgment. After this motion was ripe, the hearing set on this motion was continued six times, many times at the request of the defendants. This provided the defendants over a year to identify an expert and to seek to supplement their discovery. Still, the defendants failed to do so. Due to the defendants lack of diligence in adhering to the scheduling order for this case and in pursuing discovery, the court concludes that a continuance would be inappropriate in this case.

CONCLUSION

The court GRANTS the Receiver's Motion for summary judgment (ECF No. 11) and DENIES the defendants' motion for leave to file a supplemental brief (ECF No. 41) and DENIES the defendants' motion for a rule 56(f) continuance. (ECF No. 13).

DATED this 3rd day of December, 2010.

BY THE COURT:

_____

Dee Benson
United States District Judge